CARR, J.
The questions decided by the court in this case, when it was here before, were, in their general complexion, pretty much the same with those now presented to us; both sets of questions depending on the law of evidence, principally, and growing out of the testimony offered by the plaintiff, in tracing his pedigree and fixing the character of his female ancestor. I may refer, therefore, to the view then taken by me of the general rule excluding hearsay evidence, *and the exceptions to that rule, particularly, that which embraces questions of pedigree. Looking to Clarke’s affidavit, the circuit court seems to have understood his evidence to mean what his own words do not import: for it told the jury, that so much of it as stated that the witness had always understood that Sybill was an indian, might be received, and weighed by them. But Clarke said he had understood, that Sybill was descended from indians, but whether on the father’s or mother’s side, he was unable to say. The difference is most essential. As the judge interpreted the evidence to the jury, the reputation was, that Sybill was herself an indian; thereby reaching, at once, the point which the plaintiff had in view, descent from an indian woman : but, as the affidavit really was, it only proved, that the witness had understood that Sybill was, (not an indian, but) descended from indians, and whether on the father’s or mother’s side he was unable to say; and this, so far from proving descent from an indian woman, left that point wholly unsupported by the reputation to which the witness testified. This misapprehension of the judge was doubtless produced» by the hurry and confusion of a jury trial. It was contended *471 at the bar, that as the court excluded all the affidavit but that part which stated the hearsay, that Sybill was an indian, and there was no such statement in it, the whole was in effect excluded. But this was not the meaning of the court, nor the practical construction given to its opinion. The affidavit went to the jury; and, it was said, the jury would read it for themselves, and not take the court’s version of it. This they might do, as in any other case where the court undertook to instruct them on the weight or effect of evidence: they might disregard such an instruction ; yet it would be error in the court to give it. On this ground, without touching any other, I think this instruction wrong.
We come next to the exception taken to reading West’s deposition. It was moved to exclude it, because it detailed the statements made to West by his mother, and these were *made after Sybill had brought suit for her freedom. The court instructed the jury, that if it was proved that Sybill was dead ten or fifteen years before that statement was made, then the declaration of Mrs. West, that she had lived on the same plantation with Sybill, that she was an indian woman, and had the appearance of an indian, was competent evidence to have such weight as the jury should think it entitled to, and that her declaration about Sybill’s mother, and about the report of her right to freedom, were inadmissible evidence. As to the first objection, that the statement of Mrs. West was post litem motam; I was a good deal inclined to think that this was an objection of weight; for on examination, I found that the courts, conscious of the intrinsic weakness of hearsay evidence, and anxious to confine it to the exceptions long since established, had, with strictness and even jealousy, excluded it, wherever the statements had been made post litem motam; and the lis mota, is not confined to the institution of the suit, but to the origin of the controversy, nor is it necessary to prove (in order to the exclusion of the evidence) that the person making the declaration, knew of the lis mota. From these considerations, I was at first inclined to give this objection much weight: for the lis now prosecuted by the plaintiff, is the same which Sybill moved in the general court in 1772. But we are told she died about that time. The suit now before us, was not brought till near half a century after-wards ; and it seems from the deposition of West, that bismother made the declarations to him when he was from fifty to sixty years old; some twenty or thirty years after the death of Sybill. I rather think, that, after such a lapse of time, the doctrine of lis mota cannot exclude these declarations.
Next, was the court right in admitting the hearsay evidence given by West, namely, the statements of his mother that Sybill was an indian? This question was much discussed at the bar. On the one side it was insisted, that we ought to hold strictly to the rule excluding hearsay, and *not enlarge the exceptions already established; that the question of what country, nation or tribe a person was, is not a question of pedigree, and therefore cannot be proved by hearsay: and the cases in the supreme court of the U. States, of Mima Queen v. Hepburn, and Davis v. Wood, were cited in support of this position. On the other side, it was insisted, that the reason on which hearsay was admitted in any case, was, that it was the best evidence the nature of the case would admit; and that the rule ought to extend to every case within its reason: that in cases like the present, if you exclude hearsay and reputation, you shut the door completely against every claim to freedom, which depends on tracing back the line of pedigree to an indian woman, as there can be no living witness to speak from his own knowledge of transactions so remote, and no written documents exist to fix the fact. It was insisted too, that this court has by many decisions, settled the rule, that in suits for freedom, hearsay evidence may be received to establish a descent from an indian woman. My own opinion on this subject, was pretty plainly intimated, when this case was formerly before us. The precise point then raised, was, whether the “current report and belief in the neigh-bourhood, in 1770, that Sybill was entitled to her freedom,” should be given in evidence to the jury. But in discussing that question, I relied on principles and authorities, which seem to me equally to reject hearsay evidence to prove the country, nation or tribe, of the claimant’s ancestor. Such facts do not belong to pedigree. To take them in, you must add another exception to the rule that hearsay evidence is inadmissible. This, I am not disposed to do. I consider hearsay evidence so weak intrinsically, so incompetent to satisfy the mind of the existence of facts, so liable to become a cover for fraud and fabricated evidence, that I cannot agree to enlarge its sphere, even though the refusal should seem to operate harshly on the class of cases now under consideration. Such was the decision of the federal court, in Mima Queen v. Hepburn and Davis v. 'x'Wood ; and I think it the sound and safe course. It is true, as asserted at the bar, that the decisions of this court, in several cases, have gone to let in hearsay to prove descent from an indian woman; and this is the consideration which I have found it most difficult to get over; for I am exceedingly reluctant to unsettle what is at rest. But all who have examined the earlier cases in our books, must admit, that our judges (from the purest motives, lam sure) did, in favorem libertatis, sometimes relax, rather too much, the rules of law, arid particularly the law of evidence. Of this, the court in later times, has been so sensible, that it has felt the propriety of gradually returning to the legal standard, and of treating these precisely like any other questions of property. Those decisions admitting hearsay, I have considered as instances of this departure from strict rules, which I should be well pleased to see corrected, if my brethren should think with me: but if they shall think me wrong, and those decisions right, I shall rest perfectly contented with their opinion.
The next exception states, that the plaintiff then introduced the testimony of sev *472 eral witnesses tending to prove, that Sybill was the mother of Biddy, who was the mother of the plaintiff', and- that Sybill was a native american indian/ Whereupon the defendant moved the court to instruct the jury, that if the plaintiff founded his right to freedom on these facts, it was incumbent on him to prove, that Sybill was brought into this country, at a time or under circumstances which rendered it unlawful to enslave her; but the court refused; and instructed the jury, that if they believed the facts last mentioned, the plaintiff was entitled to recover, unless the defendant should prove, that Sybill had been lawfully made a slave; which fact the jury might presume from the long time during which she, and her posterity, had been held in slavery, and other circumstances; but it was competent for the plaintiff to rebut this presumption by proving the ignorance and helplessness of the plaintiff and his ancestors, and other circumstances. I *cannot approve of this instruction. We know, that by our laws of a former day, indians might be held in slavery. This court in Hudgins v. Wright, and some other cases, carriéd back the repeal of these laws to 1691. This was upon the idea, that a law of that date, granting free trade with the indians, had been decided by the old general court, to have repealed all laws tolerating indian slavery: but by the publication of Jefferson’s reports (Robin v. Hardaway, p. 109), we see, that in 1772, this point was most ably discussed before the general court; and they decided that the act of 1691 did not repeal the indian slave laws, but that they were repealed by that part of the act of 1705, enacting who should thenceforward be slaves. And there can be no doubt, I think, that this is the correct exposition of the laws. Prior to 1705, then, our laws justified in-dian slavery. When a plaintiff, therefore, traces back his descent to an indian woman, unless he proves also that she was brought into the country since 1705, he has not made out a case for freedom. The indian woman may have been lawfully held in slavery: and whether she was or not, is a matter depending on facts, as to which I do not think the court should give the jury any instruction, or decide on whom the onus lies. Observe the effect of the instructions in the present case. The jury are told, that if they believe Sybill was a native american indian, the plaintiff was entitled to recover, unless the defendant should prove that she was lawfully made a slave. How could he prove it? There are no written documents of such facts: you do not suffer him to resort to reputation and hearsay: and no living witness can speak to facts happening a hundred years back. During this hundred years, the defendant and those under whom he claims, have held the plaintiff and his progenitors in slavery: and this holding, the court tells the jury, is a fact from which they may presume slavery; but this presumption, they are instan'tly told, may be rebutted by the ignorance and helplessness of the plaintiff and his ancestors; an ignorance and helplessness, not particular and personal to these parties, but *inherent in their condition, always existing as to those held in slavery. Of what avail, then, is this presumption, derived from a slavery of a hundred years, when it is, and must always be rebutted, in other words destroyed, by the very slavery which gives it birth? It is a mere delusion of words; and the instruction amounts simply to this, that whatever slave, by rumour, reputation, hearsay (the loosest ahd weakest of all possible evidence), can carry back his descent to an indian woman, shall be free; for it is vain to add, unless the defendant can prove the indian woman was lawfully enslaved, when you take from him the only possible means after the lapse of a hundred years, of proving it. I think the judgment should be reversed, and the case sent back for a new trial &c.
GREEN, J.
The first question, I shall advert to, is that presented by the last exception taken at the trial: Whether, evidence being given by the plaintiff, tending to prove, that he was descended in the female line from a native american indian woman, and nothing more being proved on either side, the prima facie presumption was that she was free, or on the contrary a slave? This question as to the onus pro-bandi, in such cases has been several times considered and decided in this court, particularly in Hudgins v. Wright and Hook v. Nanny Pagee. In the first of them, the circumstance that the granddaughter was white, had no influence further than to repel the idea, that any female negro had been amongst her female ancestors: the plaintiffs proved that they were descended from an old indian, the time of whose introduction was not ascertained, and besides, neither her mother nor grandmother were white, there being gradual shades of difference in the colour of the three: 'and the judges, Fleming, Carrington, Lyons and Tucker held, unanimously, either that all indians introduced into our community, at any time, were prima facie to be presumed to be free, or that, if the date of their introduction did not appear, that the prima facie presumption was, that they were american *indians, and brought in after the act of 1705, and therefore free; at the same time agreeing, that such presumptions might be rebutted by proper proofs. All the judges did not give their opinions seriatim, but the facts of the case were such, as that it must necessarily have been decided upon one or the other of those alternatives. In Hook v. Nanny Pagee', the doctrine asserted in the foregoing' case, was fully recognized by the whole court, Brooke, Cabell and Coalter; and they went a step farther; for, upon a verdict that the jury had, upon their own inspection, ascertained that the plaintiffs were white, they held that they were free, although a white person may be a slave, according to our laws, if all his female ancestors were slaves; as would be the case, if any one of his remote female ancestors was an indian or negro slave, though he would be a white person, unless one of his great grandfathers or great grandmothers was a negro, all his other ancestors being white. This prima facie presumption could only be justified by the historical fact, *473 ■that a greater number of indians had been incorporated into our community, as servants than as slaves, and that the descendants of the females of those introduced as servants, born during their service, continued in servitude to an advanced age in successive generations; facts, probably, well known to the elder judges who decided the case of Hudgins v. Wright, as well from their acquaintance with the history of the condition of the indians found amongst us, and the descendants of the females of them, derived from our legislation in respect to them, as from the proceedings and evidence in the multitude of cases upon that subject, decided in the general court in June 1772, in which parol evidence was given reaching back to the close of the century before the last, part of which now exist in the form of depositions filed in those cases. These were the depositions of persons at that time very old. I have examined them. When this case was formerly under consideration here, I endeavoured to shew from the authentic sources of our legislation, that, in fact, the class of indian ^'servants, and the descendants of the females of them bound to service until an advanced age in all successive generations, always greatly exceeded that of indian slaves, and the descendants of the females of- them: further sources of information have fortified that conclusion, and enabled me to correct some errors in the views which I then took of that subject: these I shall now refer to as succinctly as possible.
In 1671, sir William Berkeley, in answer to the inquiries of the lords commissioners, informed them, that there were then in Virginia no slaves but negroes. And there was no statute afterwards, authorising native american indians to be enslaved, until that of 1682, (which related only to those of remote tribes, and not those in our neighbourhood, who were our confederates and tributaries) with the following exceptions: that the acts of 1676 and 1677 allowed prisoners taken in the then war to be held as slaves (that war ended in 1677, and was not afterwards renewed) ; and that those taken by the small garrisons stationed at the head of tide water in our four great rivers, were allowed to be enslaved by an act of 1679. From the character of the service, as ascertained by our legislation, there could have been few or no in-dians enslaved under the acts of 1676, 1677 and 1679; and whatever were enslaved under the act of 1679 were emancipated by a subsequent act of 1684, repealing and declaring it null and void to all intents and purposes, as if it had never been made. (As to the effect of such a repeal, see 19 Vin. Abr. Statutes, £). 9, pi. 3, p. S32.) So that no native american indians were held in slavery after the act of 1684, repealing that of 1679, except those taken in the war of 1676 (which continued only one year after the act authorizing captives to be enslaved) and those enslaved under the act of 1682, before the passing of the act of 1705, by which the act of 1682 was repealed, as well as those of 1676 and 1677, in respect to all native american indians. That this was the effect of the repealing clause of the act of 1705, concerning servants and slaves, was decided by the general court, in the case of Robin v. Hardaway, *in June 1772, and in Hannah v. Davis, in April 1787, and by this court, in Coleman v. Dick and Shelton v. Barbour. The court, in Robin v. Hardaway, as reported by Mr. Jefferson, decided, that the act of 1691 allowing a free trade with all indians, did not repeal the act of 1682. And in the case of Henry & al. v. Atty & al. the same court in June 1772, decided upon a special verdict, that the act of 1682 continued in force until 1705, and gave judgment against many descendants of indians introduced and held as slaves between 1682 and 1705.
The sources for the supply of indian slaves, natives of the continent of America, between 1682 and 1705, must have been very scanty, adverting to the state of things with respect to our neighbouring indians during that period; and there was never any source of a supply from abroad, except such as might be kidnapped in the West Indies, for there slaves were more valuable than here.
In respect to the sources for the supply of indian servants, in addition to what I said on that subject on the former occasion, I find, that all such female servants who had bastard children of any sort, were bound to add to their previous term of service (which was generally thirty-one years) one year on account of each child : and considering their condition, and their habitual and early connexions with negroes, they could hardly, in any case, be entitled to be discharged from service until they were past child bearing. Their children, in turn, were bound to serve until thirty-one, and as long after, as the addition of a year for each child they had during their time of service would amount to. I find further, that the act of 1765, careful^ discriminated between the children of mulatto servants (the bastard children of white women by negroes, and their descendants) and those of such indian servants; discharging the former thereafter born from any obligation to service, and requiring them to be bound out as apprentices; while the former acts requiring a service to the age of thirty-one, from the children of in-dian women servants, in all generations, with the addition *of one year’s service for every child born during their service, were left in full force as to them, and so continued until the general repealing clause of the act of 1819. So that as our laws were framed, the females of this class of servants were almost always bound to service until they were past the prime of their lives.
No possible contrivance, short of reducing the whole race to absolute slavery, could be better calculated to obscure and confound their right to freedom, and to destroy the evidence of it.
Considering these facts, in respect to the condition of indians introduced from time to time into Virginia, as slaves or servants, respectively, and of their descendants; facts derived from infallible sources of information ; I cannot for a moment doubt the propriety of the former decisions of this *474 court, and of the instruction under consideration, that proof that a party is descended in the female line from an indian woman, and, especially, a native american, without any thing more, is prima facie proof of his right to freedom; liable to be repelled by proof, that his race has been immemorially held in slavery; which may be in turn rebutted by the consideration of the ignorance and the helpless condition of persons in that situation, aided by other circumstances, such as that manjr such were bound by law to a service, equivalent in all respects to a state of temporary slavery, until they attained the age of thirty-one years, and in many cases (according to circumstances existing in almost every, case) for an uncertain term beyond that age. These circumstances, whether sufficient or not to repel, the presumption founded upon a long continued state of slavery or service, are proper to be submitted to the consideration of the jury for their determination as to their weight and effect. And they may be properly strengthened by other circumstances (if proved by competent testimony) submitted to the jury for their consideration, and to have such effect as to them may seem proper; as, that one or more of such ancestors had openly asserted her or their right to freedom, *or had instituted proceedings in a court of justice to assert such right, at a time when the evidence supporting the claim, or condemning it decisively, must have existed, but was prevented from prosecuting those proceedings with effect, by death or some other uncontrollable or reasonable cause; or, that deceased persons, who were in a situation to know the facts upon which the right depended, with no motive to misrepresent them, had declared the existence of those facts (I say, those facts) which would give the freedom claimed, such as that she was the child of an indian servant woman by a negro or mulatto, or that she was a native american indian introduced here since 1705.
This introduces the consideration of another point, strongly insisted on by the appellant’s counsel, that hearsay evidence is not admissible to prove any specific fact, such as the race or nation to which the ancestor to whom the party traces his pedigree belonged; and this upon the authority of two cases in the supreme court of the U. States, in which the court laid down that principle in those very terms, and applied it, in one case, to hearsay evidence that the ancestor was a south american indian, and, in the other, an english woman, the one born in South America, the other in England. This was in direct opposition to the uniform course of decision, in such cases, in the courts of Maryland, where the cases arose, as was affirmed by the counsel, and by judge Duvall, who dissented, and who was peculiarly experienced in the administration of the laws of that state; and is in the very teeth of the whole course of decision in the supreme courts of this state. Thus, in Jenkins v. Tom, a witness having testified, that another who was dead, told him, that when he was about twelve years old, the women in question were brought to Virginia, in a ship, and were called indians, and had the appearance of indians; and this evidence was sanctioned by the unanimous opinion of the court. The decision was afterwards approved in Shelton v. Barbour. And in Pegram v. Isabel, a witness testified, that an old man whose name he did not recollect, had given evidence *in a former suit between a female ancestor of the plaintiff, and another under whom the defendant did not claim, that she was descended, according to general reputation, in the maternal line from an indian ancestor, who was imported into this state since the year 1705. This evidence, the hearsay in respect to general reputation testified by an old man, in a cause between other parties, to neither of which was the defendant a privy, and that extrajudicially (for it was given upon a writ of inquiry), was unanimously sanctioned by the court, as proper to go to the jury. In these cases, the court admitted hearsay evidence of general reputation as well as particular declarations in respect to the specific facts of the race and nation of the ancestor, her appearance and complexion and the manner and the time of the importation, which were very material. I confess, I do not comprehend the rule laid down in the cases in the supreme court of the Ü. States, which have been cited, that hearsay evidence and general reputation are inadmissible to prove specific or particular facts. All evidence, both direct or by hearsay and reputation, consists in the proof of specific and particular facts: I can conceive no other object of any proof, which can be offered as evidence in a court of justice. The general rule is, indeed, such as is there laid down; but there are admitted exceptions to it, depending upon no arbitrary decisions of the courts of justice, but upon sound principles of necessity and rea'son, according to the. nature of the facts, and the circumstances of each particular case, and, particularly, upon the fundamental maxim of evidence, which requires only .the best evidence which the nature of the case admits, in the ordinary course of human affairs and transactions. If the fact be of such a nature, as that in the ordinary course of things, if it really existed, it might reasonably be expected that direct evidence of it would also exist, hearsay or reputation is inadmissible. Such was the case in which this rule was first distinctly applied, in terms, to the exclusion of hearsay evidence by lord Kenyon, with the concurrence of another *judge, where the question was, whether a particular spot called the Cow-close was a part of a particular estate. Outram v. Morewood, 3 T. R. 123, 14 East, 131, in notis. But it is universally admitted, that pedigree is an exception to this general rule, and may, according to the circumstances of the case, be proved by hearsay and reputation. Now, proof of pedigree consists exclusively of specific facts, and many of them, such as marriage, birth, death, consanguinity, and in England seniority, and in many cases, nationality, and finally and above all, identity; without which all the rest would be unavailing. If any one of these facts were indispensibie to make out a title in any *475 particular case, the exclusion of hearsay evidence as to that fact, might frustrate the direct evidence proving all the other points necessary to the title, for the want of direct evidence of that also. X have met with no case in the english books, in which hearsay evidence has ever been rejected in respect to any one of those facts: but there are cases, in which such evidence has been admitted to establish each of those facts, and especially, seniority and identity. Thus, in X)oe v. Pembroke, 11 East, 504, the question was, which of two brothers was the elder; and an old unexecuted paper, purporting to be the will of the grandfather of the person last seized of the estate in question, who was dead, and the paper found in a drawer in his house, was received as evidence of the fact of senioritj’, and had the effect of proving it. And in Zouch v. Waters, 12 V.in. Abr. Evidence, T. b, 87, pi. 5, p. 244, the question was, who was the heir of William Zouch : the plaintiff proved that he was descended from William Zouch; but it was shewn on the other side, that the property in question belonged to William Zouch of Pilton (and it would have been the same question, if it had belonged to William Zouch, the Scotchman, or the irishman, or the indian) and an old book from lord Oxford’s libra^q containing the pedigree of William Zouch of Pilton, and signed by him, was admitted to prove that the plaintiff was not a descendant of William Zouch of Pilton, though he *was of some other of the name of William Zouch. These papers were received as evidence of the declarations of their authors, and therefore hearsay evidence, to all intents and purposes as it would have been if those declarations had been proved by parol. And reputation, though somewhat differing in its character from hearsay, is admissible in all cases where hearsay is. 3 Stark, on Ev. part IV. 1178, 10 East, 120. I cannot think that an estate in England could be lost by the rejection of hearsay evidence in respect to the country or county or other place of the nativity of an ancestor, or of the colour of his hair, or any other quality which served as a circumstance to identify him ; and if not, is there any difference in the cases, or any reason in law and justice, that the descendant of an indian here, shall not recover his freedom upon the precise evidence, which would enable a peer of England to recover his estate there?
In respect to the descendants of a female indian servant, in the female line, it might happen, that, in a succession of generations, none of them would live until their term of service expired; for not only such who were the children of a negro or mulatto man, but all their descendants born during their service, were bound to serve till their ages of thirty-one, and an additional year for everj' bastard child (as all their children were) born during their obligation to service ; and they were moreover liable to an additional service of six months from a very early period of our legislation, for every instance of fornication. In such a case, if in every generation, witnesses had gone to' court and testified to their knowledge of their state of service, and the testimony had been committed to record, even that precaution would have been unavailing, if, when the first of the race entitled to be exempt from service, sued for freedom, all who knew the remote ancestor and her condition were dead, and hearsay were inadmissible to prove that she was a free in-dian servant.
I have perhaps spent too much time upon this point; but it is important to the descendants of all female indian servants, *many of whom are still legally bound to a temporary service, and to a large stock of emancipated slaves, who are bound to service in all' generations to the age of thirty years, under Pleasants’s will. Pleasants v. Pleasants, 2 Call, 319. All of the former class now, and all of the latter in a few years, must be reduced to unconditional slavery, if it shall become the settled law, that the identity and condition of their remote ancestors cannot be proved by hearsay evidence or traditionary reputation.
I proceed to the next general question presented in this case. An objection was taken here, which was not insisted on in the court below, to the character of all the evidence adduced to prove the pedigree of the plaintiff: that it does not conform to the rule, that hearsay evidence and reputation of pedigree, to be admissible, should proceed from the familj' of the party or those intimately connected with it, and so having the best opportunity of knowing, and having at the time no inducement to misrepresent, the facts. This objection is, I think, sufficiently answered by referring to all the cases without exception, in which hearsay has been admitted, in such cases, by this court; and there have been many. Such a rule is utterly inapplicable to any case like this; and if necessity affords any exception, in any case, to a general rule of evidence, those cases form an exception to that rule, which is founded in good sense, and dictated by the circumstances prevailing in England. The family, relations and intimates of the parties, in such causes as this, are disqualified as witnesses by their class and condition, and the master and his family bj' their interest. The respectable neighbours of the parties who have the best opportunity of knowing, and no motive to misrepresent the truth, are alone competent to speak with effect upon the subject. Such was Mrs. West in this case; and her declaration comes fully up to the spirit of the rule alluded to, which has its source in the all pervading principle that lays at the foundation of all the laws of evidence, that the best competent evidence the nature of the case admits of, is required.
*But the evidence of her declarations are objected to, because they were made after an order in the general court authorizing Sybill to sue for her freedom. This order was made in October 1772, probably suggested by the decisions of the court at the preceding term, but was never prosecuted even by taking out a writ; for what reason, does not appear. The declarations of Mrs. West were made twenty or thirty years after the death of *476 Sybill; and the objection is that they were made post litem motam, and therefore were wholly inadmissible. The reason of the rule on this point, is, that in such a state of thing's, the declaration may be made with a view to influence the event of the contest, or upon the suggestion of a party, or if evidence of reputation be offered, it might have arisen out of that very contest. None of these reasons apply here. No contest was then depending or in contemplation; and it is impossible to imagine a motive for misrepresentation on the part of Mrs. West. She spoke of her personal knowledge of Sybill, and probably of her mother; for her son who testifies, was born about 1744, and she, consequently, as early as 1728; and I see no reason for excluding that part of her declaration which relates to Sybill’s mother. In the case of the Berkeley Peerage, the father had made an entry on the leaf of a bible, stating the time of the birth of his eldest son by his wife A. and declared at the time, that he made it for the purpose of proving the age and legitimacy of his eldest son, in case the same should be questioned in any case or cause whatever, oy any person, after his death. He died, and the very controversy he anticipated and provided against, ensued. This declaration was admitted by all the judges to be competent evidence, although the circumstances in which it was made went greatly to its discredit. Is there any thing in this case, so strongly calculated to discredit the declarations of Mrs. West, as there was in that, to discredit the declaration of the father? or any -thing to discredit her’s in any degree? It would, indeed, be a singular result, if the proof that Sybill, had been allowed by the court to institute *a suit for her freedom as an indian, (a circumstance well calculated to repel the presumption of legal slavery from her long continuance in servitude) should have the effect of excluding the proof of the fact, that she was in truth an indian, and that her mother was one also, by the declaration of one now dead, who was personally acquainted with her, having resided on the same plantation with her, and who might have known her mother personally.
The remaining ground of exception to the instruction given to the jury, in respect to part of the depositions, of Clarke and West, is, that in truth, there were no such declarations in them, as were stated by the court to be admissible; Clarke not stating, that he had always understood that Sybill was an indian, nor West, that his mother had said, that she had the appearance of an indian. This exception is, I think, well founded. The instructions were calculated to mislead the jury, more or less, by inducing them to believe, that the court was of opinion, that such was the effect of the depositions. And for this cause the judgment should be reversed.